Andrea METZL, Plaintiff,

v.

Robert LEININGER, et al., Defendants.

No. 93 C 5337.

United States District Court,
N.D. Illinois,
Eastern Division.

May 31, 1994.

Robert B. Millner, Emily Sarah Nozick, Sonnenschein, Nath & Rosenthal, Sylvia M. Neil, American Jewish Congress, Chicago, IL, for plaintiff.

Thomas A. Ioppolo, Illinois Atty. Gen.'s Office, Chicago, IL, for Robert Leininger.

Patricia J. Whitten, Miguel Angel Rodriguez, Michael Joseph Hernandez, Chicago,

IL, for Chicago Bd. of Educ., D. Sharon Grant and Argie K. Johnson.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

Plaintiff Andrea Metzl ("Metzl") is a Chicago Public School teacher. She currently teaches learning disabled children at Edgebrook Elementary School. In July 1993, Metzl brought this suit against Robert Leininger, State Superintendent of Education, the Chicago Board of Education, D. Sharon Grant, President of the Chicago Board of Education, and Argie K. Johnson, General Superintendent of the Chicago Public Schools.[1] Metzl alleges that a provision of the Illinois School Code ("School Code") designating Good Friday as one of twelve state mandated school holidays violates the Establishment Clause of the U.S. Constitution[2] and Article I, Section 3 of the Constitution of the State of Illinois.[3]

This matter is now before the court on the parties' cross-motions for summary judgment. For the reasons stated below, the court declares the challenged portion of the School Code unconstitutional and enters a permanent injunction prohibiting its enforcement. Plaintiff's motion for summary judgment is granted. Defendants' motion is denied.

### Background

Enacted in 1941, Section 24–2 of the School Code designates Good Friday and 11 other days as legal school holidays. 105 ILCS 5/24–2 (1992).[4] Good Friday is consid-

---

1. This suit was originally brought as *Weinstein v. Edgar*, 93 C 1102, by Grace Weinstein who, like Metzl, was a Chicago Public School teacher challenging the constitutionality of the Good Friday school holiday. Some time after filing suit and after considerable discovery had been taken, Weinstein took early retirement. Weinstein then sought to substitute Metzl as a plaintiff in that case. Judge Aspen denied the request and dismissed the case with prejudice. *See Minute Order*, dated August 17, 1993. When Metzl filed the instant suit, the parties agreed that the discovery conducted in the *Weinstein* case could be used in this case as well. With the exception of the parties' names, the complaints filed in both cases are virtually identical. (Def. Statement of Uncontested Facts at 1–2).

2. The Establishment Clause states that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I, cl. 1. The

Establishment Clause is made applicable to the states through the Fourteenth Amendment. *Everson v. Board of Educ.*, 330 U.S. 1, 5, 67 S.Ct. 504, 506, 91 L.Ed. 711 (1947).

3. This Section provides in relevant part: "No person shall be required to attend or support any ministry or place of worship against his consent, nor shall any preference be given by law to any religious denomination or mode of worship." The protections provided under this provision of the Illinois Constitution are generally considered to be coextensive with those offered under the First Amendment to the U.S. Constitution. *See In re Marriage of Goldman*, 196 Ill.App.3d 785, 143 Ill.Dec. 944, 952, 554 N.E.2d 1016, 1024 (1990).

4. The other legal school holidays are: New Year's Day, Dr. Martin Luther King, Jr. Day, Lincoln's Birthday, Casimir Pulaski's Birthday,

ered by Christians as one of the holiest days of the liturgical year. A solemn, even mournful day, Good Friday commemorates for Christians, Jesus Christ's suffering and death on the cross. (Pl.Ex. B at ¶¶ 5–7; Pl.Ex. C at ¶¶ 5–8).[5] Unlike Christmas, Good Friday is generally seen as having no secular components. (*Id.*). As is the case on all legal school holidays, Illinois public schools are closed on Good Friday. Teachers and other school employees are not required to work and receive no reduction in pay for the holiday. 105 ILCS 5/24–2 (1992). Good Friday, however, is not an official state holiday for Illinois agencies and offices,[6] and the overwhelming majority of public institutions of higher education in Illinois conduct classes on Good Friday. (Pl. Statement of Uncontested Facts at ¶ 15).

Although no legislative history exists explaining the legislature's purpose in designating Good Friday as a legal school holiday, the parties have uncovered a proclamation issued by the Governor of Illinois in March, 1942, highlighting the significance (at least in his view) of the newly recognized state holiday. The Proclamation reads as follows:

> The hallowed traditions of almost two thousand years cluster around the Friday just preceding Easter Sunday. Good Friday, as it has come to be called, is a day charged with especial meaning to multitudes throughout the Christian world.
>
> Good Friday was lately given appropriate statutory recognition in Illinois. By enactment of the last regular session of our General Assembly, the day was made a legal and school holiday throughout the State.
>
> The widespread commemoration of Good Friday, always becoming, is eminently fitting in these times of unusual stress.
>
> NOW, THEREFORE, I, DWIGHT H. Green, Governor of the State of Illinois, by this official proclamation, do hereby direct attention to this significant day, Good Friday, which falls this year on April 3, and commend the secret rites and ceremonies of the occasion to the thoughtful consideration of churchgoers and believers throughout our State.

(Pl.Ex. H).

In addition to Section 24–2, two other sections of the School Code are relevant to the court's inquiry. First, under Section 26–1(5), "[a]ny child absent from a public school on a particular day ... because the tenets of his religion forbid secular activity on a particular day" is not required to attend school on that day. 105 ILCS 5/26–1(5) (1992). This same section further provides that "nothing in this paragraph 5 shall be construed to limit the right of any school board, at its discretion, to excuse an absence on any other day by observance of a religious holiday." *Id.* Under this latter provision, several school districts in suburbs north of Chicago have for some time closed the public schools on the Jewish holidays of Rosh Hashanah and Yom Kippur when those holidays fall on school days. (Def. Statement of Uncontested Facts at ¶ 9).[7] Finally, the School Code also provides that:

---

Memorial Day, Independence Day, Labor Day, Columbus Day, Veteran's Day, Thanksgiving Day, and Christmas Day. 105 ILCS 5/24–2 (1992).

5. As plaintiff's expert, Reverend Dean Kelley explains: "Good Friday is not an occasion for frivolity or festivities. Among practicing Christians, having a party or a wedding on Good Friday would be unthinkable.... In many Christian churches, the altar paraments for Good Friday are black, a color used only on that one day of the year (aside from funerals), and the cross on the altar and crosses carried in procession by acolytes are often veiled in black or violet gauze as a sign of mourning." (Pl.Ex. B at ¶ 6).

6. The Illinois State Board of Education is the only state agency (that defendants are aware of)

that closes on Good Friday. (Pl. Statement of Uncontested Facts at ¶ 15).

7. The parties took depositions of nine different school districts: Evanston Township High School—District 202, Glenview Board of Education—District 34, Winnetka Board of Education—District 203 (New Trier High School), Winnetka Board of Education—District 36, Skokie School District 68, Glenbrook High School—District 225, Deerfield Board of Education—District 109, Deerfield–Highland Park Board of Education—District 113 (Highland Park High School and Deerfield High School), Glencoe Board of Education—District 35. Each of these districts except Glenview District 34 currently closes school at least one day of Rosh Hashanah and Yom Kippur. (Def. Statement of Uncontested Facts at ¶ 9).

Any child enrolled in a public school who is unable, because of the observance of a religious holiday, to attend classes on a particular day ... shall be excused from any examination or any study or work assignments on such ... day. It shall be the responsibility of the teachers and ... administrative officials ... to make available to each child who is absent from school because of the observance of a religious holiday to make up any examination, study or work requirements.... No adverse or prejudicial effects shall result to any child because of his availing himself of the provisions of this section.

105 ILCS 5/26–2b.

### Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the parties acknowledge, the material facts in this case are undisputed. (Def. Motion for Summary Judgment at 1; Pl. Motion for Summary Judgment at 1). Summary judgment is appropriate as a matter of law.

### Discussion

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof: ...." U.S. Const. amend. I. As the Supreme Court has made clear, the Establishment Clause is much more than a simple pledge that "no single religion will be designated as a state religion." *School District v. Ball,* 473 U.S. 373, 381, 105 S.Ct. 3216, 3221, 87 L.Ed.2d 267 (1985). Resting upon "the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere," the Establishment Clause has been held to prohibit the government from promoting or affiliating with any religious doctrine or organization, discriminating among individuals on the basis of their religious beliefs, delegating state

power to religious institutions, and entangling itself in religious affairs. *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U.S. 573, 590–91, 109 S.Ct. 3086, 3099–100, 106 L.Ed.2d 472 (1989) (citations omitted). State or federal government conduct favoring one religion over another is clearly anathema. "Whatever else the Establishment Clause may mean (and we have held it to mean no official preference even for religion over nonreligion), it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions)." *Id.* at 605, 109 S.Ct. at 3107. (citations omitted).

Total separation of church and state, however, is neither possible nor desirable. *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971); *Committee for Public Education & Religious Liberty v. Nyquist,* 413 U.S. 756, 760, 93 S.Ct. 2955, 2959, 37 L.Ed.2d 948 (1973). Indeed, a failure to recognize the many important ways in which government and religion cross paths would run counter to the affirmative mandate of accommodation (not merely tolerance) of religious beliefs and practices embodied in the Free Exercise Clause. *Cf. Allegheny,* 492 U.S. at 657, 109 S.Ct. at 3135 (Kennedy, J., dissenting) ("Establishment Clause permits government some latitude in recognizing and accommodating the central role religion plays in our society."). It would also ignore more than two hundred years of national history. *See Lynch v. Donnelly,* 465 U.S. 668, 674–78, 104 S.Ct. 1355, 1359–62, 79 L.Ed.2d 604 (1984) (recounting numerous incidents of official government acknowledgment of role of religion throughout nation's history). As the court explained in *Lynch,* "[t]he line between permissible relationships and those barred by the Clause can no more be straight and unwavering than due process can be defined in a single stroke or phrase or test. The Clause erects a 'blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.' " *Lynch,* 465 U.S. at 678–79, 104 S.Ct. at 1362 (quoting *Lemon,* 403 U.S. at 614, 91 S.Ct. at 2112).

Struggling with the inherent tension contained within the twin religion clauses of the First Amendment, the Court has generally fallen back on the three-part test first enunciated in *Lemon v. Kurtzman* when analyzing alleged violations of the Establishment Clause. To pass the *Lemon* test, a statute or practice which touches upon religion must: (1) have a secular purpose, (2) neither advance nor inhibit religion in its principal or primary effect, and (3) not foster an excessive entanglement with religion. *Lemon*, 403 U.S. at 612–13, 91 S.Ct. at 2111. Though *Lemon* has been the subject of considerable criticism over the years, and even pronounced dead on at least one occasion,[8] the Supreme Court has recently reminded us that the case is still controlling precedent, and thus continues to provide the necessary framework for analyzing the Establishment Clause violation alleged in the case at hand. *See Lamb's Chapel v. Center Moriches Union Free School Dist.*, —— U.S. ——, ——, n. 7, 113 S.Ct. 2141, 2148, n. 7, 124 L.Ed.2d 352 (1993). *Cf. Gonzales v. North Township*, 4 F.3d 1412, 1417 (7th Cir.1993); *Cohen v. Des Plaines*, 8 F.3d 484, 489 (7th Cir.1993).

In recent years, the Supreme Court has refined the inquiry under *Lemon*, directing courts to pay close attention to whether the challenged governmental practice either has the purpose or effect of "endorsing" religion. *See Allegheny*, 492 U.S. at 592–94, 109 S.Ct. at 3100–02 (citing cases). Endorsement of one religion or another "sends a message to nonadherents that they are outsiders, not full members of the political community,"and an accompanying message to adherents that they are insiders, favored members of the political community." *Lynch*, 465 U.S. at 688, 104 S.Ct. at 1367. Thus, in *Allegheny*, 492 U.S. at 601–02, 109 S.Ct. at 3105, a divided Supreme Court found that a creche displayed at the center of a county courthouse in Pennsylvania violated the Establishment Clause by conveying the message that the government endorses Christianity over

other non-Christian faiths. Similarly, in *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 17, 109 S.Ct. 890, 900, 103 L.Ed.2d 1 (1989), the Court struck down a tax exemption that was limited to religious periodicals on the grounds that it "effectively endorsed religious belief." *See also American Jewish Congress v. City of Chicago*, 827 F.2d 120, 128 (7th Cir.1987) (presence of creche in Chicago's City Hall "inevitably creates a clear and strong impression that the local government tacitly endorses Christianity"); *Friedman v. Board of County Commissioners*, 781 F.2d 777, 780–782 (10th Cir.1985) (en banc) (county seal including Latin cross and Spanish motto translated as "With This We Conquer," conveys a message of endorsement of Christianity). As plaintiff properly points out, the Court's endorsement analysis does not replace the *Lemon* test, but rather provides a lens through which the first two prongs of the test (purpose and effect) can be properly evaluated.

### The Good Friday Cases

In determining whether a state statute designating Good Friday as a legal school holiday violates the Establishment Clause, the court is not writing on a blank slate. Thus, before undertaking the case specific inquiry required under *Lemon*, the court will review three prior cases in which courts ruled on the constitutionality of state laws declaring Good Friday legal holidays.

This analysis begins with the Ninth Circuit's majority opinion in *Cammack v. Waihee*, 932 F.2d 765 (9th Cir.1991), *reh'g en banc denied with dissenting opinions*, 944 F.2d 466. In *Cammack*, five Hawaii taxpayers and residents challenged the constitutionality of a Hawaii statute designating Good Friday an official state-wide holiday. *Cammack*, 932 F.2d at 767. In upholding the statute, the *Cammack* court initially noted that its decision was not controlled by the

---

8. *See Lee v. Weisman*, —— U.S. ——, ——, 112 S.Ct. 2649, 2687, 120 L.Ed.2d 467 (1992) (Scalia, J., dissenting). Indeed, Lemon's reemergence in *Lamb's Chapel v. Center Moriches Union Free School Dist.*, —— U.S. ——, ——, n. 7, 113 S.Ct. 2141, 2148, n. 7, 124 L.Ed.2d 352 (1993), prompted Justice Scalia to declare in mock hor-

ror: "Like some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried, Lemon stalks our Establishment Clause jurisprudence once again...." *Id.* at ——, 113 S.Ct. at 2149.

Supreme Court's ruling in *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). In *Marsh*, the Court had upheld the Nebraska state legislature's practice of opening its daily sessions with a prayer from an official chaplain largely on the grounds that legislative prayer was too deeply imbedded in the history and tradition of the country to be cast aside under formal Establishment Clause scrutiny. *Id.* at 795, 103 S.Ct. at 3338. Though recognizing that Good Friday had been celebrated in Hawaii throughout its statehood, the *Cammack* court acknowledged that the Good Friday Holiday was not so deeply embedded in the state's history to warrant an extension of the *Marsh* court's narrow "historical exception" to traditional Establishment Clause jurisprudence. *Cammack*, 932 F.2d at 772.

The court then turned to the three-pronged *Lemon* test. Looking first to the purpose of the statute, the court found that nothing in the bill's legislative history suggested a religious motive for its ultimate passage. *Id.* at 775. Rather, the court found that the statute's primary purpose was simply to provide for more legal holidays for the state. *Id.* at 776.[9] Under the second prong of the *Lemon* test, the court concluded that the primary effect of the Good Friday Holiday was no more violative of the Establishment Clause than the Sunday closing laws upheld thirty years earlier by the Supreme Court in *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961): *Id.* at 778. In support of its analogy the court found that the increasing secularization of the Good Friday holiday paralleled the earlier secularization of Sunday as a national day of rest.[10] Lastly, the court concluded that Hawaii's designation of Good Friday as an official state holiday did not constitute "an excessive entanglement with religion," rejecting plaintiff's "argument" that the required consultation of a liturgical calendar to determine on which day the holiday falls violated this final prong of the *Lemon* test. *Id.* at 780–81.

In *Griswold Inn, Inc. v. State*, 183 Conn. 552, 441 A.2d 16 (1981), the Supreme Court of Connecticut similarly addressed the question of state recognition of Good Friday in the Establishment Clause context. At issue in *Griswold* were three state statutes prohibiting the sale of liquor on Good Friday. *Id.* 441 A.2d at 17. Like the Ninth Circuit in *Cammack*, the Connecticut Supreme Court analyzed the constitutionality of the challenged statutes under the three-part test set forth in *Lemon*. Though a failure to satisfy just one prong of the *Lemon* test would have supported a finding of unconstitutionality, the *Griswold* court found that the challenged statutes violated all three *Lemon* factors. *Id.* 441 A.2d at 21.

Noting that liquor was available for sale throughout the state of Connecticut on all other state holidays, the court quickly rejected the defendants' contention that the statutes were motivated by a legitimate concern for the dangers associated with uninhibited alcohol consumption on "a holiday which enjoys state-wide celebration." *Id.* 441 A.2d at 20. The state's singling out of Good Friday was particularly suspect, the court found, because "the passage of time has not converted Good Friday into a secular holiday or freed it of its clearly religious origins," adding that "[t]here is no doubt that Good Friday lacks widespread public popularity or acceptance as a secular holiday." *Id.* 441 A.2d at 21.

Looking to the primary effect of the statute's prohibition, the court found two principal defects. First, the Good Friday prohibition impermissibly gave the state's "clear stamp of approval" to Christian rites and practice, suggesting an "illegal bias in favor of Protestant and Catholic forms of Christianity over Eastern Orthodox, non-Christian and non religious practices and beliefs." *Id.* Second, the state's prohibition on the sale of

---

9. The court explained, "[i]t is of no constitutional moment that Hawaii selected a day of traditional Christian worship rather than a neutral date, for its spring holiday once it identified the need." *Id.* at 776.

10. As an example of the emerging secular quality of the Good Friday holiday, the court noted that "the Good Friday holiday has become a popular shopping day in Hawaii and businesses have benefited from the three-day weekend created as a result of the holiday." *Id.*

alcohol was found to unconstitutionally impose the religious customs of one segment of the population on the entire state. *Id.* Finally, the court held that the challenged statute also ran afoul of the entanglement clause by requiring the state to monitor the observance of a religious holiday and by creating political divisions and debate along religious lines. *Id.* 441 A.2d at 22.

Lastly, in *Mandel v. Hodges,* 54 Cal. App.3d 596, 127 Cal.Rptr. 244 (1976), the court held unconstitutional a state practice of closing all government offices from 12 noon to 3 p.m. on Good Friday. Like the *Griswold* court, the court here found that the challenged state practice violated all three prongs of the *Lemon* test. Distinguishing the Sunday Closing Law cases cited approvingly in *Cammack,* the court held that the three-hour "holiday" failed the first two prongs on the grounds that Good Friday was a "wholly religious" day. *Id.* at 611–14, 127 Cal.Rptr. 244. "[The challenged practice] is directly beneficial to religious institutions. Its promulgation by the Governor and its execution throughout the state office complex, amount to an observance by the State itself (in the sense of its recognition, if not its active ceremonial participation), of the 'wholly religious day' which the trial court found Good Friday to be." *Id.* at 613–14, 127 Cal. Rptr. 244. Finally, the Court cited the "divisive political potential" of the Good Friday holiday as evidence of the excessive entanglement prohibited under the third prong of the *Lemon* analysis. *Id.* at 615, 127 Cal.Rptr. 244.

### Application of the Lemon Test

Against this backdrop, the court now turns to the constitutionality of Illinois' designation of Good Friday as a legal school holiday under the framework provided in *Lemon.*

### A. *Purpose*

Under the purpose prong of the *Lemon* test, the court " 'asks whether [the] government's actual purpose is to endorse or disap-

prove of religion' ". *Edwards v. Aguillard,* 482 U.S. 578, 585, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987) (quoting *Lynch,* 465 U.S. at 690, 104 S.Ct. at 1368) (O'Connor, J., concurring). While state conduct motivated in part by a clearly secular purpose may satisfy the "purpose" test, the First Amendment requires the court to carefully scrutinize mixed motive cases and strike down any statute where the articulated purpose is perceived to be insincere or a sham. *Edwards,* 482 U.S. at 587, 107 S.Ct. at 2579; *Wallace v. Jaffree,* 472 U.S. 38, 57, 105 S.Ct. 2479, 2490, 86 L.Ed.2d 29 (1985). As Justice O'Connor explained, the purpose prong of the *Lemon* test "is not satisfied ... by the mere existence of some secular purpose, however dominated by religious purposes." *Lynch,* 465 U.S. at 690–91, 104 S.Ct. at 1368.

One obvious place to begin when inquiring about a statute's purpose is its legislative history. What did its drafters have to say about the statute's purpose? Indeed, in *Wallace,* 472 U.S. at 56–58, 105 S.Ct. at 2489–91, the Court relied heavily on the legislative record to invalidate an Alabama law authorizing prayer in school. Unfortunately, detailed records of Illinois legislative history prior to the 1970's are scarce, and no such record is available here. Nevertheless, as noted previously, the parties have identified a proclamation from the governor issued shortly after the General Assembly's designation of the Good Friday school holiday which may shed some light on the legislature's motives. At the very least, the proclamation tells us that the governor, for one, viewed the State's recognition of the Good Friday holiday as a general endorsement of the religious spirit surrounding "the Friday just preceding Easter Sunday." (See Def.Ex. H).

As the court observed in *Mandel,* 54 Cal. App.3d at 612, 127 Cal.Rptr. 244, potentially improper religious motives can also be inferred from the very nature of Good Friday itself. Unlike Christmas or Thanksgiving which have both secular and religious connotations,[11] Good Friday remains a wholly reli-

---

11. *See American Civil Liberties Union v. City of St. Charles,* 794 F.2d 265 (7th Cir.1986) ("Christmas is a national holiday, celebrated by nonobservant Christians, as well as by believing Chris-

tians. It owes its status, in part anyway, to the fact that most Christian symbology either is unrelated to Christianity or is no longer associated with it in popular understanding."); *County of*

gious day. *Id.* "While non-believers may associate Sundays with recreation, Thanksgiving with eating turkey, and Christmas with sending and receiving gifts and greeting cards, one is hard pressed to come up with any analogous practices associated with Good Friday. Good Friday connotes the Crucifixion—and nothing else." *Cammack*, 944 F.2d at 471 (Reinhardt, J., dissenting). Clearly, the Illinois legislature was well aware of Good Friday's purely religious nature when it enacted Section 24–2. Connecting the dots, it hardly strains one's imagination to surmise that the Illinois legislature's designation of Good Friday as a legal school holiday was motivated at least in part by a desire to officially endorse the holiday's religious message.

Still, courts are generally reluctant to attribute unconstitutional motives to the states, and in the Establishment Clause context, courts will defer to a state's sincere articulation of a legitimate secular purpose. *Edwards*, 482 U.S. at 586, 107 S.Ct. at 2579. Here, defendants assert that the State's designation of Good Friday as a legal school holiday was motivated by a sincere and legitimate desire to accommodate the religious practices and beliefs of a large percentage of its students and ensure that the smooth operation of its schools would not be impaired by their absence. (See Def. Brief at 7–8). The State's decision to close schools, defendants explain, is not "advancement" of religion, but rather "is simply the facilitation of religious liberty and an effort to insure that rather than open schools on a day where absenteeism is likely to be high, staff and students make the most of the finite number of official school days they have." (Def. Reply Brief at 8). As the court explained in *Corporation of Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos*, 483 U.S. 327, 335, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987), "[u]nder the *Lemon* analysis, it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." Thus, at least in theory,

defendant's proffered explanation of the purpose behind the state's designation of Good Friday as a legal school holiday could satisfy the first prong of the *Lemon* test.

However, defendants' characterization of Section 24–2's purpose is troubling. As an initial matter, defendants offer scant evidence in support of their broad assertion that if Good Friday were a regular school day, absenteeism would be so great that the schools would be unable to function effectively. In *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989), the Court struck down a Texas sales tax exemption for religious periodicals, suggesting that accommodation of religion is generally permissible only where "a concrete need to accommodate" has been demonstrated:

> In this case, the State has adduced no evidence that the payment of a sales tax by subscribers to religious periodicals or purchasers of religious books would offend their religious beliefs or inhibit religious activity. The State therefore cannot claim persuasively that its tax exemption is compelled by the Free Exercise Clause in even a single instance, let alone in every case. *No concrete need to accommodate religious activity has been shown.*

489 U.S. at 18, 109 S.Ct. at 901.

Here, the State relies heavily on certain newspaper articles from the 1940's describing in general terms the significance of the Easter weekend holidays to the many thousands of Christians in the Chicago area and the efforts made by area churches to accommodate the anticipated flood of worshipers. (Def. Brief at 7–8). Defendants also cite a recent survey of U.S. church membership as well as some anecdotal evidence gleaned from the parties' depositions which taken together certainly suggest that at least some Christian students and school employees would not attend school if Good Friday were a regular school day. (Def. Brief at 8; Def. Reply at 4–5).

Specifically, defendants cite the results of a survey contained in the 1993 World Almanac

*Allegheny*, 492 U.S. at 631, 109 S.Ct. at 3121 ("the celebration of Thanksgiving as a public holiday, despite its religious origins, is now generally understood as a celebration of patriotic values rather than particular religious beliefs.").

which suggest that close to 150 million Americans are members of either Protestant or Roman Catholic churches. (Def. Brief at 8, *citing* 1993 *World Almanac* at 718). In terms of deposition testimony, defendants offer the observations of Dr. Philip Price, now the superintendent of Glencoe's elementary school and formerly a superintendent of a school district in Ohio. Commenting on the lack of a state-wide Good Friday holiday in Ohio, Dr. Price testified that "[d]epending on the district, [the lack of a holiday could be a problem. There were individuals, there were parents that found that to be hardship." (Def. Reply at 4; Price Dep. at 32). Defendants also cite the deposition testimony of a Skokie School District 68 school official who noted that at least four employees were absent on "Orthodox Good Friday" (a regular school day) for religious reasons. (Def. Brief at 4, *citing* Fritts Dep. at 16–17).

To assert, based on this evidence, that Illinois public schools would be unable to function if Good Friday were a regular school day is quite a stretch. As plaintiff points out, the Board of Education is the only state agency that is closed on Good Friday and the vast majority of public institutions of higher education hold classes that day. Conspicuously absent from defendants' case is any indication that any of these institutions or state agencies have suffered as a result of excessive absenteeism by Christian students and employees on Good Friday. While acknowledging that defendants' efforts were hampered by the simple fact that the Good Friday school holiday has been on the books for more than fifty years, the court finds the evidence presented on this point sorely lacking. Moreover, even if a legitimate showing could be made that particular school districts would be unable to function effectively on Good Friday because of excessive absenteeism, the State's asserted purpose would still be suspect. School Code Section 26–1(5)'s grant of school-closing discretion to individual school districts (*see* discussion *infra* ) obviates any need for the declaration of a *state-wide* school holiday on Good Friday.

As Justice Souter explained in his concurring opinion in *Weisman*, —— U.S. at ——, 112 S.Ct. at 2677, "[w]hatever else may de-fine the scope of accommodation permissible under the Establishment Clause, one requirement is clear: accommodation must lift a discernible burden on the free exercise of religion." Here, however, it is not at all clear precisely what governmental burden on religion the state is lifting. As defendants point out, Illinois has had a long standing policy of allowing school students and school employees the opportunity to take days off for religious reasons. *See* 105 ILCS 5/26–1(5) (1992). Indeed, to the State's credit, the Illinois School Code further provides for make-up examinations and assignments for students who miss class for religious reasons, and "that [n]o adverse or prejudicial effects shall result to any child because of his availing himself of the provisions of this section." 105 ILCS 5/26–2b. Thus, in contrast to the typical accommodation case, the State's designation of Good Friday as a legal school holiday does not relieve individuals "from generally applicable rules that interfere with their religious calling." *Weisman*, —— U.S. at ——, 112 S.Ct. at 2676 (citing *Bishop*, 483 U.S. 327, 107 S.Ct. 2862; *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

Finally, defendants assert that the legitimate accommodation purposes underlying the Good Friday holiday are best seen when this section is placed in the context of the statute as a whole. When evaluated in this light, the State claims that Section 24–2's designation of Good Friday as a legal school holiday is properly seen as just one of a series of carefully calibrated responses to a range of situations calling for accommodation:

> for the religion with the most adherents, Christianity, the public schools are closed state-wide on an important religious holiday ... for larger minority religions, such as Judaism, the School Code authorizes the local district to close completely on days where a significant number might be absent for religious reasons ... for smaller minority religions, the School Code permits the student to miss school on religiously significant days without penalty.

(Def. Reply at 8–9). As discussed below, there is a fine line between a "carefully cali-

brated response" to accommodation and an impermissible attempt by the state to prioritize or rank religious practices and beliefs—a line which this court believes the State has clearly crossed. Finding that Section 24-2's designation of Good Friday was primarily motivated by a desire to endorse the values held sacred by one particular religion at the expense of other "minority" religions, the court holds that the challenged portion of the Illinois School Code fails the first prong of the *Lemon* test.

## B. *Effect*

The second prong of the *Lemon* test looks to the "principal or primary effect" of the challenged statute or practice. *Lemon*, 403 U.S. at 612, 91 S.Ct. at 2111. The effect of a statute or state practice depends on the message that it communicates. *Allegheny*, 492 U.S. at 595, 109 S.Ct. at 3102. As refined by Justice O'Connor's endorsement test, the relevant question becomes: "whether the symbolic union of church and state effected by the challenged government action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *Ball*, 473 U.S. at 390, 105 S.Ct. at 3226.

In answering this question, this court is guided by two general principles that have long played a central role in our Establishment Clause jurisprudence. First, the inquiry into the effect of governmental action touching on religion must be conducted with special care when the challenged conduct impacts upon children in their formative years. *Ball*, 473 U.S. at 390, 105 S.Ct. at 3226. As the court explained in *Weisman*, — U.S. at ——, 112 S.Ct. at 2658,

What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy.

Second, the Establishment Clause prohibits government from conveying a message that religion or a particular religious belief is favored or preferred. *Allegheny*, 492 U.S. at

593, 109 S.Ct. at 3100–01 (citing *Jaffree*, 472 U.S. at 70, 105 S.Ct. at 2497. *See also Abington School District v. Schempp*, 374 U.S. 203, 305, 83 S.Ct. 1560, 1615, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring) ("[t]he fullest realization of true religious liberty requires that government ... effect no favoritism among sects or between religion and nonreligion"); *City of St. Charles*, 794 F.2d at 270 ("modern Supreme Court, however, has treated the Establishment Clause as a directive to the courts to strike down all public acts ... whose primary purpose or predominant effect is to promote one religious group at the expense of others of even promote religion as a whole at the expense of the nonreligious."). With these principles in mind, the court finds that Illinois' designation of Good Friday as a legal school holiday conveys the impermissible message that the government endorses "the individual religious choice" of Christians throughout the state.

As one of only twelve legal school holidays in the state of Illinois, Good Friday undeniably occupies a place of distinction in the official state calendar. One need only briefly consider some of the other designated school holidays—such as Martin Luther King, Jr. Day, Memorial Day, or Independence Day— to surmise that a typical Illinois schoolchild might think that the government considers Good Friday to be worthy of special honor. By the same token, non-Christians and Eastern Orthodox students are reminded that their holy days somehow failed to make the grade.

In *Cammack*, the court found that certain secular aspects of Good Friday, at least as celebrated in Hawaii, diluted any official endorsement of Christianity that its designation as an official state holiday might be thought to convey. *Cammack*, 932 F.2d at 778–79. Analogizing to the Sunday Closing Laws upheld in *McGowan*, the court explained that Hawaiians had long enjoyed the three-day Easter weekend holiday as an additional opportunity to engage in wholly secular pursuits such as shopping or sightseeing. *Id; see also Cammack v. Waihee*, 673 F.Supp. 1524, 1535–3687146653 (D.Hawaii 1987). Defendants posit the same argument here, stating: "Non-believers can treat the three-day

Easter weekend as a totally secular event if they want." (Def. Brief at 18).

This court finds defendants' argument unpersuasive. As noted above, Good Friday is unique among the State's twelve legal school holidays for its wholly religious significance. Unlike Christmas or Thanksgiving, which have numerous non-religious connotations, Good Friday has no identifiable secular components. While non-believers are obviously free to pursue their secular interests on Good Friday, they undoubtedly do so with the knowledge that the State has sanctioned the holiday on account of its special religious significance. These individuals can no more ignore the imprimatur that the State has placed on the Good Friday holiday than could courthouse visitors ignore the significance of the creche at issue in *Allegheny*. With regard to the *McGowan* analogy, the dissent in *Cammack* captured the essential distinction between the Sunday Closing Laws at issue there and the Good Friday holiday challenged here with the following observation:

> We need think only of the schoolchild who asks her teacher why she gets Sundays and Good Friday off. The answer must be that the former are days of rest and the latter a commemoration of the death of Jesus Christ.

*Cammack*, 932 F.2d at 786 (Nelson, J., dissenting). This observation has particular resonance here where plaintiff has alleged that she has had to explain the significance of the Good Friday holiday to her students on numerous occasions. (Pl. Statement of Uncontested Facts at ¶ 9).

Defendants attempt to downplay this clear message of endorsement by pointing out that several school districts north of Chicago have traditionally closed schools in their districts on the Jewish Holy Days of Rosh Hashanah and Yom Kippur, pursuant to 105 ILCS 5/26–1(5). Although this section of the School Code does not specifically designate these days as official holidays, it has generally been interpreted to allow individual school districts to close school whenever a significant number of students might be absent for religious reasons.[12] Also, as noted previously, for smaller minority religions, the School Code permits the student to miss school on religiously significant days without penalty. ILCS 5/26–1(5). Thus, the State argues that it is incorrect to suggest that it has not afforded adherents of other religions the same deference or respect that it has shown Illinois' Christians. (Def. Reply at 9).

Again, the court disagrees. While Illinois has indeed made efforts to accommodate the religious needs of its non-Christian schoolchildren, it cannot be denied that it has singled out Christianity for special treatment. By elevating Good Friday to legal school holiday status throughout the state, Illinois has sent a clear message to Christians that as adherents of a majority religion, they are specially entitled to state recognition and accommodations that members of minority religions only qualify for upon demand. This is the very message that the Establishment Clause is intended to prohibit. *Lynch*, 465 U.S. at 687, 104 S.Ct. at 1367 (O'Connor, J., concurring) ("[t]he Establishment Clause prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community."). What defendants describe as "a calibrated response" to varying needs for accommodation, is perhaps more likely perceived by impressionable Illinois schoolchildren and others throughout the state as a loosely structured ranking system for their religious beliefs and practices. Concluding that the State's designation of Good Friday as a legal school holiday conveys the impermissible message that Christianity is a favored religion within the state of Illinois, the Court finds the challenged portion of the School Code unconstitutional under the second prong of the *Lemon* test as well.

## C. *Entanglement*

Finally, like the *Cammack* court, the court here finds that the State's designation of Good Friday as a legal holiday does not lead to excessive government entanglement with religion. Cases that turn on the entanglement prong of the *Lemon* test typically involve some form of state aid to religious institutions (such as parochial schools) or re-

---

12. The question of whether this practice violates the Establishment Clause is not before this court.

750

lated schemes requiring state monitoring of religious entities. *See, e.g., Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985); *Roemer v. Board of Public Works,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976); *Walz v. Tax Com. of New York,* 397 U.S. 664, 674–75, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970). Here, in contrast, the court is hard pressed to conceive of a scenario under which the mere designation of Good Friday as a legal holiday could be seen to excessively entangle government with religion. At worst, the statute requires school officials to occasionally consult liturgical calendars to determine on which day of the year Good Friday falls. Simply put, entanglement is not an issue.

### Conclusion

The issues raised in this case are important and difficult ones. Indeed, throughout the history of this nation, courts have struggled mightily with the slippery dictates of the First Amendment's Religion Clauses. Faced with a fifty year old statute with no legislative history, the court's task here has been especially challenging. Nonetheless, after carefully considering the many thoughtful arguments raised by the litigants in their well written briefs, the court concludes that the challenged portion of the Illinois School Code cannot stand. Finding that Illinois' designation of Good Friday as a legal school holiday was primarily motivated by a desire to endorse the Christian faith and conveys the impermissible message that Christianity is a favored religion within the state of Illinois, the court declares the challenged portion of Section 24–2 of the Illinois School Code to be unconstitutional and enters a permanent injunction prohibiting its enforcement. Plaintiff's motion for summary judgment is granted. Defendants' motion is denied.